875 A.2d 916

LAURA RANDAZZO, PLAINTIFF–RESPONDENT, v. JOSEPH J. RANDAZZO, JR., DEFENDANT–APPELLANT.

Argued February 28, 2005—Decided June 28, 2005.

*Robert B. Cherry,* argued the cause for appellant.

*Erin E. O'Connell Sussman,* argued the cause for respondent (*O'Connell & Sussman,* attorneys).

Justice WALLACE delivered the opinion of the court.

This matrimonial action presents the issue of whether a trial court may order the sale of marital real property prior to a final judgment of divorce. We hold that a trial court has the equitable power to order such a sale and, if the circumstances warrant, to order the proceeds be distributed to serve the best interests of the parties.

## I.

We recite the facts pertinent to the disposition of this appeal. Plaintiff Laura Randazzo and defendant Joseph J. Randazzo, Jr. were married on November 14, 1954. The parties have two emancipated children. Plaintiff and defendant both graduated high school. Although defendant did not have any subsequent education, plaintiff studied accounting at Bloomfield College for two years.

In 1961, the parties acquired commercial property and an adjoining two-family residence in Clifton, New Jersey. They operated an auto repair facility and a licensed used car dealership at that location. Defendant repaired and sold high-end cars and plaintiff did the bookkeeping for the businesses as well as becom-

ing a realtor in 1978. The businesses grew to gross between $350,000 and $400,000 annually. A substantial part of that income resulted from a towing contract with the City of Clifton that grossed approximately $100,000 annually. The parties also leased out commercial building space at the Clifton location. In 1975, they purchased a home in Montclair, New Jersey, and later they purchased a vacation home in Sanibel, Florida (the Florida property).

Subsequently, the parties acquired a fifty-two-acre horse farm in Hardwick Township, New Jersey, that contained a track, barn, horse paddocks, and other features conducive to raising and training about seventy race horses. In 1992, defendant's mother gifted to the parties a home on Louise Street in Clifton, subject to a life estate in her favor. The following year the parties sold their Montclair home and purchased their final marital home next to the horse farm in Hardwick Township. The parties also bought a 3.2–acre lot adjacent to the marital home and a twenty-seven-acre lot consisting of mostly wetlands. Since 1993, plaintiff has managed and worked on the horse farm full time, but has earned little or no profit.

After approximately forty-three years of marriage, plaintiff filed for divorce on July 28, 1997. At the time of the filing, plaintiff was sixty-one years old and defendant was sixty-four years old. In her Case Information Statement, plaintiff listed no monthly income and $13,482.86 in monthly expenses. She also listed $2,802,190 in net assets and $440,916.32 in liabilities. The parties' real estate included

(1) the commercial property in Clifton, including the two-family residence;

(2) the horse farm and wetlands;

(3) the marital residence and adjacent 3.2–acre lot;

(4) the Florida property; and

(5) the Clifton house that defendant's mother gifted to both parties subject to a life estate.

After filing for divorce, plaintiff obtained defendant's consent to sell the Florida property. Afterwards, defendant resisted the sale and plaintiff filed a motion, among other things, for the sale of the

Florida property, *pendente lite* support, and appraisals of the real estate owned by the parties. In his answering certification, defendant acknowledged that he and plaintiff had worked hard to obtain considerable economic wealth, but that the loss of the towing contract with the City of Clifton had reduced their income and had caused them to exhaust their savings. He claimed that an appraisal of the Clifton commercial property had not been undertaken because neither party had the money to pay for it. Further, he asserted that plaintiff's operation of the horse farm was a drain on their finances and until they liquidated their assets, primarily the Florida property, there would be no money available for support. He acknowledged the need to liquidate assets to raise cash and admitted that he had agreed to sign the listing agreement for the sale of the Florida property.

The motion court ordered defendant to pay temporary support of $200 a week, to obtain appraisals of the residential and business real estate properties, and to pay the real estate taxes for the properties in Clifton. The court noted in the paragraph of the order authorizing the sale of the Florida property that plaintiff's request was "moot," presumably because defendant had agreed to the sale.

After defendant failed to pay the temporary alimony, plaintiff moved for additional support and other relief. On September 11, 1998, the court entered an order denying plaintiff's request for additional support, authorizing plaintiff to collect rent from the Clifton residential and commercial properties, and requiring the parties to list the horse farm and the Clifton commercial property for sale. In addition, plaintiff was authorized to sign defendant's name to the listing agreements if he refused to do so.

In October 1998, plaintiff filed an Order to Show Cause seeking authorization to sign the agreement of sale and to execute all closing documents for the Florida property, to pay the delinquent taxes on all of their real estate holdings with the proceeds, and to evenly divide the balance. Defendant certified in response that he had signed the agreement of sale for the Florida property, but

that he would not release the agreement until they reached an understanding regarding the disbursement of the proceeds. Defendant, in part, sought to use the proceeds to pay the outstanding tax liens on the Clifton properties in excess of $100,000, and the unpaid taxes on the farm and the marital residence.

The trial court granted plaintiff's request to sign the agreement of sale and the closing documents necessary for the sale of the Florida property. The court also required plaintiff's counsel, after paying the outstanding real estate tax liens on the New Jersey real estate, to place the net proceeds of the sale in a trust account. Subsequently, on December 14, 1998, the motion court authorized additional disbursements from the proceeds from the sale of the Florida property to pay certain obligations.

Trial on the outstanding issues of equitable distribution and alimony was conducted on various dates from June 14, 1999, to January 14, 2000. During that time, the trial court entered several additional orders compelling defendant to pay real estate taxes, interest, and penalties owed on the farm and the commercial property. At the conclusion of the trial, the parties requested an "early decision" limited to a determination of which offer the parties should accept for the sale of the Clifton commercial property and whether the horse farm should be listed for sale separately or with the marital home.

On January 31, 2000, the trial court rendered a written decision directing which offer should be accepted for the Clifton commercial property and ordering that the farm should be sold separate from the marital home. Eventually, the parties agreed to sell the Clifton commercial property to a different buyer. As part of that transaction, each party received approximately $4,125 per month in mortgage payments for the mortgage they took back as part of the sale.

On June 15, 2000, the court issued a comprehensive opinion, resolving all of the remaining issues concerning alimony and equitable distribution. The court expressly considered the statutory criteria set forth in *N.J.S.A.* 2A:34–23.1 in distributing the

assets and liabilities of the parties. The court found, among other things, that both parties suffered some health problems, although no expert testimony had been presented on the effect of those problems on their ability to work; neither party was capable of being self-supportive at the upper-middle-class standard of living enjoyed during the marriage; both parties contributed to the acquisition of the assets; and both parties would suffer equivalent tax consequences. The court ordered the assets equally divided, but assessed defendant a greater portion of the liabilities because he had not met his *pendente lite* obligations.

With respect to the Florida property, the court found that the property

> sold for $193,808.39. The proceeds were put into a trust account. Some $93,177.34 of such proceeds were used to pay joint debt that neither party is asking be reallocated or credited to one party.... However, during the litigation, some $95,483.53 was removed from the trust account to pay taxes on the Clifton properties; $1284.12 was removed to pay for liens owed to the New Jersey Department of Labor; $2215.40 was taken out to pay payroll taxes; $1000 was paid to attorney [ ]; and $648 was used to pay for the repair of the Cadillac. The court finds that all of the aforementioned expenses, which total $100,631.05, were the [defendant's] responsibility to pay. As indicated above, the court finds that a "50–50" distribution of assets is appropriate at the outset, but is ordering the [defendant] to pay for all of the aforementioned debts. Had $100,631.05 of the proceeds not been used to pay for debts the [defendant] was supposed to have paid, the [plaintiff] would have had access to her 50% share of the proceeds, which is $50,315.22. Accordingly, the sum of $50,315.22 shall be paid to the [plaintiff] out of the [defendant's] share of equitable distribution when either the Clifton or Hardwick property sells, whichever occurs first....

Additionally, because defendant had caused a loss of $20,000 in equity by his wrongful delay in selling the Florida property, the court ordered defendant to pay plaintiff $10,000 representing her share of that loss of equity.

The court then applied the factors set forth in *N.J.S.A.* 2A:34–23(b), and awarded plaintiff alimony of $410 per week. The court ordered the parties to submit applications for counsel fees. A final judgment of divorce was entered on September 11, 2000. On October 5, 2000, the court awarded plaintiff counsel fees in the amount of $60,357.

Defendant moved for reconsideration. Prior to a hearing on that motion, defendant filed a notice of appeal from the divorce judgment. On November 8, 2000, the trial court denied defendant's motion for reconsideration without prejudice, finding that it lacked jurisdiction to decide the motion while his appeal was pending.

On January 2, 2001, the trial court entered an amended judgment of divorce, and defendant filed a separate appeal from that judgment. Defendant's appeals were consolidated in March 2001, and a temporary remand was ordered to consider whether there were changed circumstances to justify a reduction in the alimony award.

In April 2001, plaintiff filed a motion for support arrears and permission to sell the farm and the wetlands. Defendant filed a cross motion seeking a hearing on the alimony issue. Defendant's motion was granted and the trial court conducted a plenary hearing regarding alimony beginning on January 8, 2002. Defendant argued that his health prevented him from working and that he should be permitted to retire and not pay alimony. The trial court gave defendant three months to produce expert testimony regarding his health, but defendant failed to do so. The plenary hearing concluded on May 6, 2002.

In a May 27, 2002, letter opinion, the trial court found that defendant failed to show changed circumstances, noting that his physical ailments had existed at the time of the divorce trial and that they had not deteriorated to the extent to prevent him from working. Further, the court found that although the seventy-year-old defendant had a legitimate reason for wanting to retire, the advantage of retirement to him did not substantially outweigh the disadvantage to plaintiff. The court memorialized its decision by order dated June 18, 2002. Defendant did not appeal the June 18, 2002, order; however, he moved to vacate that order. Defendant's motion was denied by order dated February 24, 2003, and again was denied by order dated June 17, 2003. The court also entered an order dated July 7, 2003, continuing the requirement that defendant pay alimony to plaintiff.

On July 24, 2003, defendant appealed the June 17 and July 7, 2003, orders. In an unpublished opinion, the Appellate Division affirmed the trial court and rejected defendant's claims of error. The panel noted that the main question on appeal was whether the judge erred in ordering the *pendente lite* sale of the Florida property. The panel distinguished *Grange v. Grange,* 160 *N.J.Super.* 153, 158–59, 388 *A.*2d 1335 (App.Div.1978), which held that absent consent, marital assets could not be sold and distributed prior to the divorce of the parties. The panel found overwhelming evidence in the record that defendant consented to the sale of the Florida property. Further, the panel found no need to address the alimony issue because defendant waived that issue by failing to raise it in his first two appeals. Moreover, defendant failed to appeal from the June 18, 2002, order, which denied his application to terminate alimony, and he failed to include a transcript of the plenary hearing conducted in May 2002. Nonetheless, the panel considered the merits of defendant's alimony claim and rejected it. The panel noted that defendant can move for relief from payment of alimony based on changed circumstances at any time.

We granted defendant's petition for certification, limited to the following questions: (1) whether the trial court erred in ordering the *pendente lite* sale of real property of the marriage and (2) whether the trial court erred in its disposition of the alimony issue. *Randazzo v. Randazzo,* 180 *N.J.* 456, 852 *A.*2d 192 (2004). Because defendant did not properly appeal the alimony issue, we conclude that certification was improvidently granted on that issue and dismiss it.

## II.

We turn now to defendant's argument that the trial court erred in ordering the *pendente lite* disposition of marital property. Defendant claims that *N.J.S.A.* 2A:34–23 authorizes the equitable distribution of marital assets only upon the divorce of the parties and not before. Further, he contends that the sale of the marital assets was not necessary for spousal support.

Plaintiff argues that the Appellate Division correctly upheld the *pendente lite* sale of the Florida property. She urges that the Florida property was the sole marital asset sold prior to the divorce judgment and there was overwhelming evidence that defendant consented to the sale. Further, she contends the trial court is vested with wide discretion to order appropriate action for the maintenance of a party and the court properly found that the liquidation of the Florida property was necessary for the parties' financial stability.

### III.

The starting point for our analysis is *N.J.S.A.* 2A:34–23. That statute provides, in part, that

[p]ending any matrimonial action ... the court may make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children, ... as the circumstances of the parties and the nature of the case shall render fit, reasonable, and just, and require reasonable security for the due observance of such orders, including, but not limited to, the creation of trusts or other security devices, to assure payment of reasonably foreseeable medical and educational expenses.

[*N.J.S.A.* 2A:34–23.]

The equitable distribution portion of that statute authorizes the court "where a judgment of divorce ... is entered [to] make such award or awards to the parties ... to effectuate an equitable distribution of the [marital] property, both real and personal...." *N.J.S.A.* 2A:34–23(h).

An early Appellate Division decision interpreting the statute severely limited the court's authority prior to the judgment of divorce. In *Grange,* the plaintiff filed a complaint for divorce, and each party sought equitable distribution of all marital assets. *Supra,* 160 *N.J.Super.* at 154, 388 *A.2d* 1335. The plaintiff claimed that he could not afford to maintain three residences, pay support, and pay the defendant's counsel fees. *Ibid.* He sought, without success, to have the defendant cooperate in the sale of their former marital residence, a condominium in Stanhope, New Jersey. *Ibid.* The plaintiff obtained an appraisal of the property indicating a negative equity of approximately $5,300. *Ibid.* He

then filed a motion to compel the defendant to execute the necessary documents to convey the property to a proposed buyer and to reserve the issue of the treatment of the loss for the final hearing. *Ibid.* The trial court authorized the sale without prejudice subject to the defendant's right to challenge the price for the property and to seek equitable distribution based upon the fair market value of the condominium. *Id.* at 156, 388 *A*.2d 1335. After the defendant sought to demonstrate that the price was too low, the trial court directed her to comply with its order. *Id.* at 157, 388 *A*.2d 1335. The defendant's motions for stay and leave to appeal to the Appellate Division were granted. *Ibid.* The Appellate Division framed the issue as "whether in a matrimonial matter the court may make a *pendente lite* order relating to the equitable distribution of the marital assets and, more specifically, order the sale of the marital dwelling absent the consent of the parties." *Ibid.* The panel reviewed *N.J.S.A.* 2A:34–23(h), and found "no statutory authority for *pendente lite* action of this kind in connection with equitable distribution." *Id.* at 158, 388 *A*.2d 1335. The panel concluded that the trial court lacked authority to order a pre-judgment distribution of the marital property absent consent of the parties and reversed the judgment of the trial court. *Id.* at 158–59, 388 *A*.2d 1335.

Several years after the *Grange* decision, the Supreme Court Committee on Matrimonial Litigation (the Committee) addressed the issue of the *pendente lite* sale of marital assets. The Committee found that the "*Grange* rule is unduly restrictive, contrary to the broad discretionary powers of a court of equity and generally unfair." *Supreme Court Committee on Matrimonial Litigation, Phase Two, Final Report,* 81 *N.J.L.J. Supp.* at 1 (July 16, 1981). Among other things, the Committee recommended that trial courts have "the discretionary power to permit a party to utilize a portion of the proceeds when ... basic living expenses cannot be paid in any other way [ ]" and "for other good and emergent cause." *Ibid.*

Consistent with the Committee's recommendations, several trial courts have distinguished *Grange* on the facts and authorized the *pendente lite* sale of marital assets in order to provide support to a dependent spouse or child. *See, e.g., Pelow v. Pelow,* 300 *N.J.Super.* 634, 646–47, 693 *A.2d* 564 (Ch.Div.1996); *Glatthorn v. Wisniewski,* 236 *N.J.Super.* 504, 509, 566 *A.2d* 242 (Ch.Div.1989); *Graf v. Graf,* 208 *N.J.Super.* 240, 246, 505 *A.2d* 207 (Ch.Div.1985); *Witt v. Witt,* 165 *N.J.Super.* 463, 465–66, 398 *A.2d* 597 (Ch.Div. 1979). For example, in *Pelow,* the plaintiff sought to have the defendant pay the mortgage, taxes, and other expenses of the home, and the defendant sought to sell the marital home. *Supra,* 300 *N.J.Super.* at 636, 693 *A.2d* 564. Because of the dire financial circumstances of the parties, the trial court ordered the listing of the home for sale. *Id.* at 646, 693 *A.2d* 564. In reaching that decision, the trial court limited the reach of *Grange* to a "sale of convenience." *Id.* at 643, 693 *A.2d* 564. The court held that *Grange* should not control where the sale was necessary "to avoid irreparable harm to a spouse and/or the children." *Ibid.* In interpreting the purpose and breath of *N.J.S.A.* 2A:34–23, the court found that "the Legislature intended to invest a court with broad discretion under [that statute] to make such orders as are 'fit, reasonable and just' to protect the parties and dependent children during and after the dissolution process." *Id.* at 644, 693 *A.2d* 564. The court found that a rigid and literal reading of the statute would not serve its intent. *Ibid.* The court concluded that the "overriding 'purpose of [*N.J.S.A.* 2A:34–23] is to give a matrimonial judge broad discretion and authority to fashion sagacious remedies on a case by case basis, which will achieve justice and fulfill the needs of the litigants.'" *Id.* at 646, 693 *A.2d* 564 (quoting *Graf, supra,* 208 *N.J.Super.* at 243, 505 *A.2d* 207). *See also Witt, supra,* 165 *N.J.Super.* at 465–66, 398 *A.2d* 597 (finding *pendente lite* sale of marital residence was proper where parties previously consented and where sale was necessary to maintain property's value).

Although we have not yet spoken to this issue, we obliquely referred to it in *Carr v. Carr,* 120 *N.J.* 336, 342, 576 *A.2d* 872

(1990). In *Carr*, we were asked to decide whether a spouse could receive an equitable distribution of the marital assets when the husband died while the divorce action was pending, or whether the spouse could elect to receive a share of her deceased husband's estate under the probate code. *Id.* at 346, 576 *A.*2d 872. We concluded that under the facts of that case, neither statutory scheme entitled the spouse to relief. *Id.* at 345–46, 576 *A.*2d 872. In discussing the equitable distribution statute, we noted that "[t]he Court has consistently interpreted [*N.J.S.A.* 2A:34–23] to authorize a distribution of martial assets only on the condition that the marriage of the parties has been terminated by divorce." *Id.* at 342, 576 *A.*2d 872 (citations omitted). We noted, however, that some of our courts "have recognized that in highly unusual circumstances some aspects of statutory equitable distribution and related forms of relief may precede a divorce judgment or survive a spouse's death before divorce." *Ibid.* (citations omitted). We found no unusual or exceptional circumstances to avoid the general rule in that case. *Id.* at 343, 576 *A.*2d 872. In fashioning the remedy of a constructive trust, we looked to the Legislature's recognition of the courts' equitable powers in the context of domestic relations. *Id.* at 351, 576 *A.*2d 872. We cited to *N.J.S.A.* 2A:34–23 for the proposition that

> pending judgment in matrimonial action, [a] court may order such *pendente lite* relief 'as the circumstances of the parties and the nature of the case shall render fit, reasonable and just,' and, upon failure of compliance, may attach property as necessary or enforce such orders 'by other ways according to the practice of the court[.]'
>
> [*Ibid.*]

We also note that subsequent to our decision in *Carr*, we concurred with the recommendation of the Special Committee on Matrimonial Litigation to amend the Court Rules to authorize the trial court to utilize marital assets to fund matrimonial litigation expenses. *See Administrative Determinations by the Supreme Court on the Recommendation of the Special Committee on Matrimonial Litigation,* January 21, 1999, 8 *N.J.L.J.* 233 (1999); 155 *N.J.L.J.* 513 (1999). Thereafter, we amended *Rule* 5:3–5(c) to provide, in part, that "[t]he court may also, on good cause shown,

direct the parties to sell, mortgage, or otherwise encumber or pledge marital assets to the extent the court deems necessary to permit both parties to fund the litigation." *See* Pressler, *Current N.J. Court Rules,* comment 4 on *R.* 5:3–5 (2005). Thus, our Court Rules authorize the trial court to order the sale of marital assets prior to the final judgment to help defray the cost of the litigation.

The Family Part is a court of equity. We read the statutory requirement that directs equitable distribution at the time of the divorce judgment to be limited by the portion of *N.J.S.A.* 2A:34–23 that authorizes the court in its discretion to "make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children." We conclude that, consistent with *N.J.S.A.* 2A:34–23 and *Rule* 5:3–5, the trial court may exercise its discretion to order the sale of marital assets and the utilization of the proceeds in a manner as "the case shall render fit, reasonable, and just."

We acknowledge that in many cases the proceeds from the sale of marital assets should be placed in escrow pending final distribution. But in other cases, the proceeds may properly be used to pay marital obligations. We leave to the discretion of the trial court the varying circumstances that may justify the sale of the marital assets and the utilization of the proceeds prior to the divorce judgment.

We take this opportunity to express our disagreement with the *Grange* decision. There, despite the apparent equities in favor of the sale of marital property prior to the divorce, the *Grange* panel reversed the trial court's judgment authorizing the sale of the marital condominium. We disapprove of *Grange* to the extent it stands for the proposition that absent consent, the trial court lacks authority to order the sale of a marital asset prior to the judgment of divorce.

## IV.

We now apply our expanded principles to the present case. Although other real property was ordered to be sold, the Florida

property was the only real property actually sold prior to the judgment of divorce.[1]   The record shows that the parties had several valuable pieces of real estate, but little money to meet the financial obligations on those properties.   In fact, in response to plaintiff's request to order him to sell the property, defendant expressly stated that the proceeds from the sale of the Florida property should be used to payoff the real estate tax liens on the Clifton properties and the farm.   Both parties believed there was insufficient income from the businesses to justify incurring the continued expense of maintaining the Florida property.   We find that the sale of the Florida property was necessary for the financial maintenance of the parties.

This case is a paradigm for why our trial courts should have the discretion to order the distribution of proceeds when distribution is deemed fit, reasonable, and just.   Because of the lack of sufficient funds to meet the financial obligations of the parties, the trial court recognized that the mounting marital obligations could be abated by the sale of the Florida property and the utilization of the proceeds to pay some of those obligations.   Further, the court required that the balance of the proceeds should be held in plaintiff's attorney's trust account and distributed at the time of the final hearing.   We conclude that the trial court acted well within its discretionary powers to order the sale of the Florida property, and that the disbursement of a portion of the proceeds to meet the pressing obligations of the parties was fit, reasonable, and just.

In sum, we hold that a trial court has the discretion to order the sale of marital assets prior to a final judgment of divorce when the circumstances of the case so justify.   Although ordinarily distribution of the proceeds from the sale of a marital asset should await the final judgment of divorce, a court has discretion

---

[1] Because we are convinced that the trial court did not abuse its discretion in ordering the sale of the Florida property, we need not address plaintiff's assertion that defendant consented to the sale.

to order an earlier distribution to serve the best interests of the parties.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.